**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

SITEL CORPORATION, ET AL.        :
                                   :
      v.                          :           Civil No. CCB-06-3457
                                   :
STONEBRIDGE LIFE INS. COMPANY   :
                                   :
                                   :

**<u>MEMORANDUM</u>**

Plaintiff SITEL Corporation ("SITEL") and its subsidiary Financial Insurance Services

Inc. ("FISI") claim damages in this action filed against Stonebridge Life Insurance Company

("Stonebridge").  Specifically SITEL and FISI claim that Stonebridge owes damages for breach

of contract.  Now pending is SITEL's motion to disqualify Stonebridge's counsel DLA Piper.

The parties have fully briefed the motion and no hearing is necessary.  *See* Local Rule 105.6.

For the reasons that follow, I will deny SITEL's motion to disqualify Stonebridge's counsel.

FISI and Stonebridge executed a Telemarketing Services Agreement ("Agreement")

effective May 1, 2002, whereby FISI served as a telemarketing vendor to call J.C. Penney (later

re-named Stonebridge) credit card holders to sell various insurance and non-insurance products

for J.C. Penney Life Insurance Company.  (*See* Compl., Ex. 1.)  The Agreement contains an

arbitration provision, which provides that any dispute arising out of the Agreement shall be

referred to an arbitration panel.  *Id.*  The plaintiffs claim that Stonebridge breached its

contractual obligations by failing to make payments required under the Agreement.

SITEL and FISI initiated arbitration proceedings on December 22, 2006, by sending a

written notice of demand for arbitration to Stonebridge.  On December 29, 2006, SITEL and

FISI filed a complaint with this court against Stonebridge to toll the statute of limitations until

the arbitration proceedings concluded.[1]  Additionally, SITEL filed this motion to disqualify

Stonebridge's counsel DLA Piper.[2]  SITEL argues that DLA Piper represents SITEL's

subsidiary, SITEL Italy, created in 2002, continued to represent SITEL Italy through the

initiation of the lawsuit, and also has an attorney-client relationship with SITEL Corp.  SITEL

argues it provided DLA Piper sensitive and confidential information during the course of the

relationship. Accordingly, SITEL argues DLA Piper is precluded from representing SITEL's

adversary in this case.

## ANALYSIS

The Maryland Rules of Professional Conduct mirror the Model Rules of Professional

Conduct and provide that:

> [A] lawyer shall not represent a client if the representation involves a conflict of interest.
> A conflict of interest exists if:
>> 1) the representation of one client will be directly adverse to another client; or
>> 2) there is a significant risk that the representation of one or more clients will be
>> materially limited by the lawyer's responsibilities to another client, a former
>> client or a third person or by a personal interest of the lawyer.

MD Rules, Rule 16-812, MRPC 1.7(a).  Notwithstanding a conflict of interest, a lawyer may

represent a client if, *inter alia*, the lawyer obtains written informed consent from the client.

MRPC 1.7(b).

"One of the Court's duties and responsibilities is to ensure that attorneys who appear

before it preserve the public's confidence in the judicial system." *Buckley v. Airshield Corp.*,

---

[1] The First Amended Complaint was filed February 26, 2007.

[2] On March 19, 2007, Stonebridge filed a motion to dismiss or stay the case pending
arbitration, arguing that all of the issues presented in the lawsuit are arbitrable.  That motion will
be decided separately.

908 F. Supp. 299, 303-04 (D. Md. 1995); *see also Rogers v. Pittston Co.*, 800 F. Supp. 350, 353 (W.D. Va. 1992). Courts should make the disqualification decision on a case-by-case basis, however, and "avoid overly-mechanical adherence to disciplinary canons" and "remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons." *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir. 1992). Disqualification is appropriate where "the conflict is such as clearly to call in question the fair and efficient administration of justice." *Gross v. SES Americom*, 307 F. Supp. 2d 719, 723 (D. Md. 2004), but the court should disqualify only when there is an "actual or likely" conflict of interest and not purely a theoretical one. *Richmond Hilton Assoc. v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982). The moving party "bears a 'high standard of proof' to show that disqualification is warranted." *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990) (*quoting Gov. of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)).

DLA Piper argues it should not be barred from representing Stonebridge in this action for three reasons. First, DLA Piper contends the arbitrators, and not this court, should decide the motion to disqualify. Second, DLA Piper argues SITEL is not a proper party to the federal action or the arbitration because SITEL is not a party to the contract and only asserts rights under the Guaranty executed by SITEL on behalf of FISI. Third, DLA Piper contends SITEL is not a current client because DLA Piper only represents SITEL Italy and not SITEL Corporation. While I conclude I have the authority to decide whether DLA Piper should be disqualified, I also find, from the evidence before me, that SITEL has not carried its burden of proving DLA Piper

should be disqualified.[3]

A.      Who should decide?

The Federal Arbitration Act gives effect to a "liberal federal policy favoring arbitration agreements." *Green Tree Fin. Corp. v. Alabama*, 531 U.S. 79, 91 (2000) (citing *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).  While courts must ensure that private agreements to arbitrate are "rigorously enforce[d]," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), the court must first determine whether the parties intended to arbitrate a particular dispute.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Tech., Inc. v. Comm'ns. Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). Therefore, a court must decide (1) whether a party agreed to submit to arbitration and (2) which disputes the parties agreed to arbitrate.

Here, neither party challenges the existence of the arbitration provision in the Agreement. DLA Piper argues the arbitration provision is broad and should be construed to cover the disqualification dispute.  In particular, DLA Piper argues that the arbitration provision covers "any dispute or difference arising out of or relating to this Agreement" and the arbitrators "shall have the power to determine all procedural rules for the arbitration, including ... any other matter relating to the conduct of the arbitration."  (Compl. at Ex. 1, Telemarketing Services Agreement.)  DLA Piper contends the possible conflict of interest arises out of the Agreement, or

---

[3] Because I am persuaded DLA Piper should not be disqualified based on the record before me, I will not reach DLA Piper's second argument about SITEL Corp.'s status as a proper party.

alternatively, that the disqualification issue is a procedural question delegated to the arbitration panel.

Whether to disqualify counsel is typically a decision in the discretion of the district court. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 749-50 (D. Md. 1997).  Where an arbitration agreement exists, however, in some circumstances it is appropriate for the arbitration panel to decide the disqualification question.  In *Hibbard Brown & Co. v. ABC Family Trust*, 772 F. Supp. 894, 897 n.4 (D. Md. 1991), in the face of Hibbard Brown's motion to disqualify counsel, ABC Family Trust argued that the district court had no jurisdiction to disqualify counsel in the arbitration proceeding, which was then ongoing.  The court in *Hibbard Brown* stated that the "disqualification question must ultimately be subjected to judicial review," but also declined to exercise the power to examine the issue.  *Id.*  The court reasoned: "[T]he asserted grounds for disqualification ... are ones which 1) are more appropriately addressed in other contexts and 2) can best be resolved after a full factual record on the underlying merits of the dispute have been established in the arbitration proceedings."  *Id.*  On appeal, noting the broad discretion the district court has in relation to attorney discipline, the Fourth Circuit held the district court did not abuse its discretion in not deciding the disqualification issue, in part because the decision on disqualification "could have the result of interfering with the arbitration proceedings."  *Hibbard Brown & Co. v. ABC Family Trust*, 1992 WL 69314 at *3 (4th Cir. 1992) (unpublished).  DLA Piper also cites *Canaan Venture Partners, L.P. v. Salzman*, 1996 WL 62658 (Conn. Super. 1996) (unpublished), where a Connecticut state court declined to rule on an attorney disqualification motion, leaving it to the arbitrators when the arbitration proceedings in the case had been ongoing for seven months.

Other district courts have held that the decision on attorney disqualification was one for the court and not for the arbitration panel.  In *Action Air Freight, Inc. v. Pilot Air Freight Corp.*, 769 F. Supp. 899, 901 (E. D. Pa. 1991), immediately before arbitration was set to begin, the court was presented with the question of whether it possessed jurisdiction over a controversy relating to possible attorney misconduct.  Noting it is the "court's responsibility to focus on the preservation of the integrity of the arbitration process," the court found it had jurisdiction over the motion to disqualify counsel.  *Id.*  The court found that the arbitrator's powers in that case were created under the American Arbitration Commercial Arbitration Rules, which contained no provision for addressing the professional conduct of lawyers, meaning that the court would not be stripping the arbitration panel of any delegated powers.  *Id.*  Similarly, in *In re Arbitration Between R3 Aerospace, Inc. and Marshall of Cambridge Aerospace Ltd.*, 927 F. Supp. 121, 124 (S.D.N.Y. 1996), the court noted in dicta that "whether attorney disqualification is arbitrable is an issue that would be appropriate for this court to decide."[4]

Here, the contract does not contain a specific provision designating attorney disqualification as a matter for arbitration.  *Hibbard Brown* is distinguishable from the present case, which is more like *Action Air Freight* and *Marshall of Cambridge Aerospace*.  In *Hibbard Brown*, the court found that the disqualification motion would best be resolved after a full factual record on the underlying merits was established.  Here, because the facts surrounding the disqualification issue are separate from the underlying merits of the case, the court and the arbitrators will not be engaged in duplicative fact-finding.  The arbitration proceedings have not

---

[4] The issue of whether attorney disqualification is arbitrable was not before the court as both parties in that case agreed that disqualification was not arbitrable.  *Marshall of Cambridge Aerospace*, 927 F. Supp. at 124.

yet begun, so deciding the issue of attorney disqualification will not disrupt the arbitration.

Indeed, given that the issue is fully briefed, it makes sense for this court to decide the

disqualification issue before the arbitration proceedings begin, so that the arbitrators can focus

on the substance of the underlying merits of the dispute.  This case is more akin to *Action Air*

*Freight* and *Marshall of Cambridge Aerospace* where the courts, while acknowledging the

federal preference for arbitration, focused on insuring the integrity of the arbitration proceedings.

Accordingly, because there will be no duplicative fact-finding and because the arbitration

proceedings will not be disturbed by the court's decision on the disqualification issue, I will

exercise my discretion to decide the issue of attorney disqualification.

B.      Conflict of interest

Under MRPC Rule 1.7(a)(1), if DLA Piper were currently representing SITEL, it would

be prohibited from simultaneously representing Stonebridge.  *See Gaumer v. McDaniel*, 811 F.

Supp. 1113, 1117 (D. Md. 1991).  While it is clear from the record that SITEL Italy is a client of

DLA Piper, the question is whether SITEL Italy's parent, SITEL Corp., is a current client.[5]  The

issue of representation of large multinational corporations arises frequently, prompting the

American Bar Association to issue a formal opinion on the topic of "Conflicts of Interest in the

Corporate Family Context." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 95-

390 (1995).  In its opinion, the ABA concluded that corporate affiliation does not create a client-

lawyer relationship ipso facto and that whether a law firm represents a corporate affiliate

depends on the particular circumstances.  *Id.* at 3-4.  The ABA Formal Opinion listed several

factors to be considered by a court in determining whether a client-lawyer relationship had been

---

[5] Obviously DLA Piper is not representing SITEL Corp. in the present litigation.

formed, including whether a fiduciary relationship resulted due to the nature of the work

performed and the confidential information divulged; whether a lawyer's representation of the

corporate client reasonably leads the affiliate to believe it is a client; whether confidential

information was given to one affiliate to represent the other affiliate; and whether the two

corporate entities disregard corporate formalities and are merely alter egos. *Id.* at 5-6.

SITEL argues it is a current client of DLA Piper or should be treated as such. As

evidence of the alleged attorney-client relationship, SITEL cites a May 22, 2006 engagement

letter written by DLA Piper to SITEL. Alternatively, SITEL argues if the letter is not sufficient

to establish the attorney-client relationship, the circumstances surrounding DLA Piper's

representation of SITEL Italy establishes such a relationship. DLA Piper, on the other hand,

argues that SITEL is not a current client of DLA Piper and that its interests in this litigation are

not adverse to its client SITEL Italy.

In the spring of 2006 Paul Earnshaw, SITEL's European corporate counsel, spoke with a

partner in DLA Piper's Rome office and "requested that DLA Piper provide an updated

engagement letter to clarify that DLA Piper was representing SITEL Corp. and SITEL Europe in

addition to SITEL Italy." (Pl.'s Mem. at Ex. 2, Earnshaw Aff. at ¶ 15.) Apparently as a result of

Earnshaw's request, DLA Piper wrote a letter on May 22, 2006, addressed to Earnshaw and

Donata Armellini, the Managing Director of SITEL Italy, which was titled "Proposal for the

provision of legal services to SITEL Italy s.p.a. SITEL Europe Ltd and SITEL Corporation."

(Pl.'s Mem. at Ex. 1. ) The first line of the letter reads: "As per your and Paul Earnshaw request

please find herein below our proposal for the legal assistance and advice to be provided to

SITEL Italy s.p.a., SITEL Europe Ltd and SITEL Corporation (collectively called "SITEL"). *Id.*

SITEL argues the proposal letter is evidence of DLA Piper's understanding that SITEL

Corporation, and not just SITEL Italy and SITEL Europe, were clients of DLA Piper and that the

letter was not a mere "proposal" letter, but rather an updated engagement letter memorializing

DLA Piper's representation of all three SITEL entities.  (Pl.'s Reply at 11-12.)

DLA Piper argues the letter was only a proposal for a future relationship and did not

create an attorney-client relationship, because it was never signed by SITEL and returned to

DLA Piper.  Indeed, after receipt of the letter, SITEL did not employ DLA Piper to perform any

legal services, and DLA Piper claims to have done no work on behalf of SITEL.  (Def.'s Opp.

Mem. at 8.).

In response, SITEL claims that even if the May 22 letter does not record an attorney-

client relationship, the course of dealing between DLA Piper and SITEL establishes such a

relationship.  SITEL argues that because SITEL Italy is a fully integrated and closely supervised

operating subsidiary, the representation of one entity is equivalent to the representation of both

entities.  As evidence that SITEL and SITEL Italy should be considered to have a unity of

interest, SITEL cites its policies of requiring monthly and quarterly financial and management

reports from SITEL Italy and limiting SITEL Italy's authority to enter into new business

ventures without approval from SITEL.  (Pl.'s Mem. at Ex. 3, Beaufait Aff. at ¶ 4.)  Further,

SITEL closely monitors SITEL Italy's business operations by requiring participation in global

management and finance meetings.  (*Id.* at Ex. 6, Peterson Aff. at ¶ 6.)

SITEL argues its legal departments' structures also demonstrate that the SITEL entities

should be considered unified for conflict of interest purposes.  SITEL Italy does not have any

"in-house" attorneys, and SITEL claims it has ultimate authority over legal issues affecting

SITEL Italy.  (Pl.'s Mem. at Ex. 3, Beaufait Aff. at ¶ 11.)  Legal issues affecting SITEL Italy

were the responsibility of Teresa Beaufait, the General Counsel of SITEL Corp., or Paul

Earnshaw, European Corporate Counsel.  Beaufait testified SITEL Italy reported to Earnshaw on

matters involving client contracts, labor and employment issues, and litigation, while dealing

directly with Beaufait on accounting issues.  (*Id.*)

      SITEL argues DLA Piper's attorneys have known about the relationship between SITEL

and SITEL Italy since the creation of SITEL Italy.  Indeed, Federico Sutti, DLA Piper's

Regional Managing Partner for Italy, met with Earnshaw before SITEL Italy was formed, and

the firm was retained to handle the legal issues surrounding the creation of SITEL Italy.

Following SITEL Italy's formation, DLA Piper did work for SITEL Italy on a variety of

commercial, tax, labor and legislation matters.  (*Id.* at Ex. 2, Earnshaw Aff. at ¶ 11.)  SITEL

contends DLA Piper was exposed to potentially sensitive or confidential information relating to

SITEL Corp.'s business, though it does not specify whether that information relates to the

current lawsuit with Stonebridge.  (*Id*. at 23-24.)

      While the relationship between DLA Piper and SITEL Italy is substantial, neither the

May 22, 2006 letter nor the limited dealings between DLA Piper and SITEL is sufficient to

establish that an attorney client relationship exists between DLA Piper and SITEL.  The May 22

letter might have established an attorney client relationship if it were an engagement letter, but it

is instead titled "Proposal" and has not been signed (and, thus, agreed and entered into) by

SITEL.  It does not appear that DLA Piper did any work for SITEL following the May 22 letter.

While DLA Piper's specific inclusion of  SITEL in the May 22 letter might indicate it intended

to represent SITEL going forward, the fact that the proposal was not formally entered into or

signed indicates that the attorney-client relationship was never formally established.  If SITEL were prepared to be represented by DLA Piper, it could and should have signed the May 22 proposal letter.  Earnshaw's attempt to have SITEL specifically covered in the contract can be read to underscore the parties' understanding that only SITEL Italy, and not SITEL, was covered prior to the May 22 letter.

The interactions between SITEL and DLA Piper also are not sufficient to establish an attorney-client relationship.  As SITEL recognizes, a lawyer representing a corporation does not necessarily represent all constituent or affiliated organizations.  (Pl.'s Reply at 13.)  Here, it appears that the entirety of DLA Piper's work for the SITEL organization concerned SITEL Italy.  While DLA Piper had some contact with SITEL's general counsel in regard to the creation of SITEL Italy, the communication appeared to be limited at all times to matters involving SITEL Italy.  SITEL does not contend that DLA Piper represented it for any matters not relating to the work done for SITEL Italy.

The current dispute between Stonebridge and SITEL does not appear to relate substantively to any work performed by DLA Piper on behalf of SITEL Italy.  While SITEL alleges that confidential information was given to DLA Piper by SITEL Europe and SITEL Italy, it does not allege that confidential information is relevant to the current dispute between Stonebridge and SITEL.  Further, the work DLA Piper performed on behalf of SITEL Italy was all performed in Europe; at no time has DLA Piper been alleged to perform any services for SITEL in the United States.  Accordingly, it was not reasonable for SITEL to believe that it was represented by DLA Piper.  Again, Earnshaw's request that DLA Piper clarify the relationship between DLA Piper and SITEL indicates the relationship was undefined.

In summary, without evidence that confidential information pertaining to the underlying lawsuit was given to DLA Piper, or that DLA Piper did any work directly for SITEL, SITEL has not carried its burden of demonstrating that SITEL Corp. and SITEL Italy should be treated as one for representation purposes.  Similarly, DLA Piper's representation of Stonebridge is not barred by Rule 1.7(a)'s general prohibition against representing clients with directly adverse interests or 1.7(b)'s general prohibitions against representation that may be materially limited by adverse interests.  Accordingly, SITEL's motion to disqualify will be denied.

A separate order follows.


   July 23, 2007                                   /s/                        
        Date                                       Catherine C. Blake
                                           United States District Judge